319 A.2d 349.

RHODE ISLAND CONSUMERS' COUNCIL *vs.*
ARCHIE SMITH *et al.*

MAY 13, 1974.

PRESENT: Paolino, Joslin, Kelleher and Doris, JJ.

DORIS, J. On February 11, 1970, the Household Goods Carriers Division and the Division of Common Carriers and Local Cartage Carriers of the Rhode Island Truck Owners' Association, Inc. (carriers) petitioned the Public Utilities Commission (commission) to permit motor carriers of household goods to charge rates dependent upon a value declared in writing by the shipper or agreed upon in writing by the shipper and carrier as the released value of goods transported for personal household goods and effects, commercial household goods and effects, and general commodities. Public hearings were held on May 6, 7 and December 3, 1971.

Russell B. Curnett, a transportation consultant, described the meaning of released rates and indicated that released rate orders have been adopted by the Interstate Commerce Commission and the Public Utilities Commissions of Connecticut, Maine and Massachusetts. He testified that the purpose of released value rates is to permit the carrier to provide a service for the shipping public at a price which would be fair for the lowest value of traffic transported. Where a particular class of traffic, such as household goods, has a wide range of values, released value rates are intended to fit the rate to the lower level thereof and permit other arrangements, such as declared excess value on insurance, to provide such protection as might be desired by the shipper of the higher valued freight.

Elmer R. Shippee of E. W. Shippee & Sons, Inc., sellers of insurance, including cargo coverage to motor common carriers of household goods, described the manner of handling loss and damage claims. He also testified as to the underwriting considerations taken into account in arriving at the amount of premium a common carrier shall remit in order to obtain a cargo insurance policy. When a shipper of household goods purchases an insurance policy and that policy contains a subrogation clause, any loss or dam-

age to any article in a shipment due to a carrier's negligence could be subrogated against the carrier for the full amount of the claim. If released value rates were in effect, the carrier would only be liable for the amount declared by the shipper. Mr. Shippee also testified that in his opinion the premium cost to a common carrier would be less under released value rates than it now is for the minimum amount of $2,000 insurance required by statute. He stressed the impact of potential catastrophic loss by the carrier on its insurance costs, but he was unable to specify the claims frequency of motor carriers or the loss ratio experienced by insurance companies because of the present unlimited liability of common carriers.

Charles J. Judge of General Adjustment Bureau, Inc. testified that released value rates would assist that firm in its adjustment of claims involving transportation of household goods. He was unable to supply any specific loss data with respect to carriers doing business in intrastate commerce in Rhode Island.

Representatives of two moving companies, John A. Creamer, Jr., of the Cady Moving and Storage Company and Frank A. Bertram of Greens Storage Warehouse, testified that unlimited liability increased their hazard in doing business. They both stressed the impact of losses to high valued goods and electronic equipment rather than to domestic household goods.

Burton C. North, a public utility accountant, testified that motor common carriers engaged primarily in the transportation of household goods are not capable of paying for full insurance coverage at existing rates, and that released value rates are essential to the continued existence of small carriers of household goods in this state. He said that without full coverage any one or two substantial losses could spell bankruptcy for some of the common carriers.

While small carriers may carry the minimum amount of cargo insurance required by statute ($2,000), this witness testified that most carriers carry cargo coverage in the amount of $10,000. Under released rates, the cargo insurance cost within Massachusetts averages eight and one-half per cent, within the state of Maine seven per cent, and within the state of Connecticut eight per cent. Within Rhode Island, without released rates, the cost is between seven and one-half and eight and one-half per cent. From the information available to this witness based upon his estimates, the range of insurance costs in Rhode Island appears to be about the same as in the other states mentioned, where released rates are in effect.

The Division of Public Utilities and Carriers conducted a survey of carriers for the purpose of obtaining information relating to the handling of loss or damage claims from January 1, 1970 to May 1, 1971, which showed the following results:

| Claims Received | Claims Paid | Amount Paid | Claims Denied | Claims Pending |
|---|---|---|---|---|
| 195 | 173 | $4,855.20 | 13 | 9 |

Charles B. McPhillips, Fire Rate Analyst for the State Division of Insurance, was presented by the Rhode Island Consumers' Council (council). He defined the meaning of "loss ratio" and rendered the opinion that the statutory requirement for cargo insurance could be raised from $2,000 to $5,000 in the event that the carriers exposure justified the increase.

Frederick E. Duprey appeared as an individual citizen to protest the granting of the petition. He testified that on March 7, 1970, a motor common carrier transported a shipment of household goods within East Providence for his account. During the course of handling the merchandise, the carrier's employees damaged a couch, and, at the time of the delivery of the shipment, the exception was

noted on the bill of lading. It was also brought to the attention of the owner of the property by an agent of the carrier at the time and place of delivery that he should affix his signature to the bill of lading in three places, one of which related that the shipment was released to the carrier at a value of 30 cents per pound per article. The owner stated that this was not explained by the carrier. Although the owner submitted an estimate of $380 to repair the couch and the carrier's appraiser submitted an estimate of between $60 and $75, the carrier paid the owner $46.50 based on the released value of 30 cents per pound at a weight estimated by the carrier to be 155 pounds.

On June 15, 1973, the commission issued its order which found:

> "That upon consideration of all evidence of record * * * the proposed regulations, amended in part, submitted in a petition filed February 1, 1970, by the Rhode Island Truck Owners Association, through its Division of Household Goods Carriers and Division of Common Carriers and Local Cartage Carriers to the extent shown in Appendix A and Appendix B, is reasonable, necessary and otherwise lawful; and, that such regulation should be adopted."

*Appendix A*

| *Released value* | *Rating* |
|---|---|
| Each article Released in Value in Accordance with the Following: | |
| (1) Released value not exceeding 10 cents per pound | 2 |
| (2) Released to value exceeding 10 cents but not exceeding 20 cents per pound | 1 |
| (3) Released to value exceeding 20 cents but not exceeding 50 cents per pound | 1 |
| (4) Released to value exceeding 50 cents but not exceeding $2.00 per pound | 1 |
| (5) Released to a value exceeding $2.00 but not exceeding $5.00 per pound | 2½ times 1 |
| (6) If consignor declines to release each article in the shipment to a value not exceeding $5.00 per pound | Not taken |

*Appendix B*

| Released Value | Rate and Charge Basis |
| --- | --- |
| Applicable to entire shipment:— | |
| (1) Released to value not exceeding 60 cents per pound per article. | Base rate and charge. |
| (2) Released to a value exceeding 60 cents but not exceeding $1.00 per pound per article. | Not exceeding 110 percent of the base rate and charge. |
| (3) Released to a value exceeding $1.00 but not exceeding $1.75 per pound per article. | Not exceeding 120 percent of the base rate and charge. |
| (4) Application to specific articles in the shipment:— | |
| If the value per pound declared on any specific article or articles exceeds the value per pound declared for the entire shipment as provided above, an additional charge which shall not exceed two percent (2%) of the total excess value declared for such article or articles may be made. | |

The council filed a petition for a writ of certiorari on June 27, 1973, which is now before us.

General Laws 1956 (1969 Reenactment) §§39-12-12 and 39-12-13 confers jurisdiction upon the Division of Public Utilities and Carriers over rates charged by common carriers. Section 39-12-28 provides that common carriers shall be liable to the owner of transported property to the full extent of damage to such property, notwithstanding

any purported limitation on liability contained in a bill of lading.

"* * * provided, however, that the provisions hereof respecting liability for full actual loss, damage or injury, notwithstanding any limitation of liability or recovery or representation or agreement or release as to value and declaring any such limitation to be unlawful and void, shall not apply to property received for transportation concerning which the motor carrier shall have been or shall hereafter be expressly authorized or required by order of the administrator to establish and maintain rates dependent upon the value declared in writing by the shipper or agreed upon in writing as the released value of the property, in which case such declaration or agreement shall have no other effect than to limit liability and recovery to an amount not exceeding the value so declared or released; and any tariff or schedule which may be filed with the administrator pursuant to such order shall contain specific reference thereto and may establish rates varying with the value so declared and agreed upon; and the administrator is hereby empowered to make such order in cases where rates dependent upon and varying with declared or agreed value would, in his opinion, be just and reasonable under the circumstances surrounding the transportation * * *"

The reference in §39-12-28 to a standard of "just and reasonable" refers to §39-12-14, which provides:

"In the exercise of power to prescribe just and reasonable rates and charges for the transportation of property by common carriers by motor vehicle, and classifications, regulations, and practices relating thereto; and to disallow rates filed by any such carriers, the administrator shall give due consideration, among other factors, to the inherent advantages of transportation by such carriers; to the effect of rates upon the movement of traffic by the carrier or carriers for which the rates are prescribed; to the need, in the public interest, of adequate and efficient transportation service of such carriers at the lowest cost consistent with

the furnishing of such service; and to the need of revenues sufficient to enable such carriers under honest, economical, and efficient management to provide such service. In any proceeding, to determine the justness and reasonableness of any rates or charges of any common carrier, there shall not be taken into consideration or allowed as evidence or elements of value of the property of such carrier, either good will, earning power, or the certificate under which such carrier is operating. At any hearing involving a change in rates, charges or classification, or in a rule, regulation or practice, the burden of proof shall be upon the carrier to show that the proposed rule, changed rate, charge, classification, regulation or practice is just and reasonable."

The carriers argue that the proposed released value rate is just to the carrier, in that it is necessary to protect the carriers from catastrophic losses. Under the present rate structure, the carriers are liable for the actual value of a shipment in the event of loss. Under the proposed rate structure, the carriers would be liable for the value of the goods declared by the shipper.

However, the carriers introduced no evidence of catastrophic losses actually suffered, or of increased costs because of unlimited liability. The only evidence in the record of losses experienced by the carriers was a survey conducted by the commission's investigator, which established the following results for the period of January 1, 1970 to May 1, 1971:

| Claims Received | Claims Paid | Amount Paid | Claims Denied | Claims Pending |
|---|---|---|---|---|
| 195 | 173 | $4,855.20 | 13 | 9 |

When we consider that this was the number and amount of claims suffered by 24 carriers, we are not convinced that the evidence establishes that carriers have been subject to catastrophic losses under the present rate structure.

The carriers also argue that the proposed released value rate structure is necessary for the financial survival of many of the small carriers of household goods because they are not able to pay for full insurance coverage at existing rates. They contend that without full insurance coverage, any one or two substantial losses could spell bankruptcy for some of the small carriers.

However, there was no showing that under released value rates the cost of insurance would be any less. In fact, the same witness who testified as to the high cost of insurance, Burton C. North, also testified that the insurance costs in Rhode Island under the present rate structure appear to be about the same as in the other states where released value rates are in effect.

Sections 39-12-14 and 39-12-28 impose the burden of proof on the carriers to show that the released value rates would be reasonable for the shipper. However, it seems to us that the evidence in the record indicates that the proposed rates would shift the risk of loss from the carrier to the shipper. Instead of incurring the present unlimited liability, the carrier would be liable only to the extent of the value declared by the shipper. The commission's order provides that:

> "* * * motor carriers * * * shall institute a procedure whereby every shipper who places an order for service for the transportation of property released to the possession of a common carrier at a declared released value is made cognizant of the meaning of declared released value and that the shipper's understanding is made known in writing * * *"

The defect in this order is that there is no procedure specified, and there is no means to enforce its provisions. It shifts to the shipper the burden of understanding the meaning and effect of released value rates, of making an intelligent and accurate estimate as to the value of its goods, and of effecting an agreement with the carrier as

to the released value. We do not consider this to be reasonable for the shipper. We find that there is no legally competent evidence in the record which shows that the proposed released value rates would be just and reasonable for the shipper. The commission's order is therefore arbitrary and unlawful.

The petition for writ of certiorari is granted, the order of the Public Utilities Commission is quashed, and the papers are remanded to the Public Utilities Commission with our decision endorsed thereon.

Mr. Chief Justice Roberts did not participate.

*Roberts & Willey Incorporated, Dennis J. Roberts, II*, for petitioner.

*Adler, Pollock & Sheehan Incorporated, Peter Lawson Kennedy*, for Intervenor, Rhode Island Truck Owners Association, respondent.