340 A.2d 125.
S. M. S. SALES CO., INC. *et al. vs.*
NEW ENGLAND MOTOR FREIGHT, INC. *vs.*
EMKAY CHEMICAL CO., INC.

JUNE 24, 1975.

PRESENT: Roberts, C. J., Paolino, Joslin, Kelleher and Doris, JJ.

44

KELLEHER, J. The plaintiffs are three foreign corporations whose goals are the distribution and sale of a line of textile goods. The manufacture of their products takes place in a mill located in Allentown, Pennsylvania. They commenced this civil action against New England Motor Freight, Inc. in December 1969. Their suit sought damages for a loss they sustained as the result of certain goods being damaged while being transported by the defendant carrier from New Jersey to Rhode Island. The carrier in its answer asserted a limitation of liability and also impleaded as a third-party defendant Emkay Chemical Co., Inc., a corporation situated in Elizabeth, New Jersey, alleging that if the plaintiffs suffered a loss, the loss was due to the chemical manufacturer. Subsequently, the plaintiffs filed a direct action against the New Jersey corporation. A nonjury trial was held in the Superior Court. The trial justice found for the plaintiffs in their suit against the motor carrier but limited recovery to the amount stipulated in the bill of lading. He ruled that the carrier could recover the amount of its liability from the chemical manufacturer and that the plaintiffs could recover the full amount of their loss, to wit, $4,315.39 from the chemical manufacturer. The third-party defendant filed a motion for a new trial. It was denied. An appeal followed.[1] Hereinafter, we shall refer to the plaintiffs as

---

[1]This is the second time this appeal is before us. Earlier we remanded the case to the Superior Court so that the trial justice could make the requisite findings of facts. *S. M. S. Sales Co.* v. *New England Motor Freight, Inc.*, 112 R. I. 366, 310 A.2d 141 (1973).

"S. M. S.," the defendant carrier as "New England," and the third-party defendant chemical company as "Emkay."

The record indicated that on February 6, 1968, S. M. S. shipped 11 cartons of "greige goods"[2] from its Allentown plant. The ultimate destination of the goods was a dye and finishing plant located in West Warwick, Rhode Island, where they would be processed and then returned to Pennsylvania. The goods were picked up by a motor carrier which we shall call "Arrow." Arrow delivered the shipment to Carlstadt, New Jersey. There the goods were transferred to New England's Carlstadt terminal and loaded onto a 40-foot-long trailer van. The van's cargo was made up of various shipments some of which were to be delivered to Connecticut, and the balance of which was destined for New England's Pawtucket, Rhode Island terminal. Part of the cargo belonged to Emkay. It consisted of some 10 to 20 steel drums of a liquid soap detergent which were to be delivered to an Emkay customer in Norwich, Connecticut. Each drum held 55 gallons of detergent. Once the van was loaded, it was attached to a trailer and New England's tractor-trailer rig moved out onto U. S. Interstate Route 95 headed north.

When the van doors were opened in Norwich, it was discovered that one of the drums had sprung a leak. The leak had spread over the trailer's floor and stained four of S. M. S's cartons. A stain mark of an inch or two in width could be seen running along the lower edge of each carton. Emkay's customer refused delivery of the leaky barrel. The barrel and the 11 cartons were unloaded in Pawtucket. The cartons were transferred to a truck and brought to the West Warwick dye and finishing plant.

Documents introduced at the trial showed that S. M. S.'s

---

[2]"Greige goods" are uncolored, unpatterned, raw goods which come off the looms and are taken elsewhere for further processing.

shipment weighed 4,980 pounds. Other evidence demonstrated that while the West Warwick dyeing and finishing process was successful in salvaging some of the stained products, just over 1,372 pounds of S. M. S.'s goods were damaged beyond repair. Since the bill of lading stipulated that the agreed value of the shipment did not exceed 50 cents a pound, New England's liability was set at $686.[3] The record sets S. M. S.'s actual loss at $4,315.39.

Before us, Emkay argues that it was not negligent and that S. M. S. has not established its right to recover the full extent of its loss. Such contentions are so devoid of merit that we will not respond to them. We will, however, discuss Emkay's contention that New England's intervening negligence immunizes it from any liability towards S. M. S.

The record makes it quite clear that New England was well aware from its past experience in transporting Emkay's drums that a drum could spring a leak while it was in transit. The carrier's treasurer told the trial justice that the carrier would place cardboard sheets under the drums to absorb "little leaks." "Big leaks," he said, presented an impossible task. The treasurer admitted that certain goods which it transported would be placed on pallets. Such a procedure keeps the cargo up off the trailer's floor. However, he made it clear that greige goods remained on the floor.

Emkay now claims that New England's failure to palletize S. M. S.'s shipment is that kind of an intervening action that breaks the chain of causation between its negligence and S. M. S.'s loss. We cannot agree.

---

[3] At the trial, it was explained that it is customary practice for a customer to set a low value on its shipments. Assuming a loss, any difference in the declared value and the shipment's actual value will be sought from the customer's insurer. We have recently alluded to this practice. *Rhode Island Consumers' Council v. Smith,* 113 R. I. 179, 319 A.2d 349 (1974).

One may not recover for an injury from the negligent act of an initial wrongdoer when a new and independent force of a responsible third party intervenes, thereby breaking the initial causation and producing the injury. *Floyd* v. *Turgeon*, 68 R. I. 218, 27 A.2d 330 (1942). It is fundamental that there may be concurring proximate causes which contribute to a plaintiff's injury and that a defendant's negligence is not always rendered remote in the causal sense merely because a second cause intervenes. *Reek* v. *Lutz*, 90 R. I. 340, 158 A.2d 145 (1960). If the independent or intervening cause is reasonably foreseeable, the causal connection remains unbroken. *Aldcroft* v. *Fidelity & Cas. Co.*, 106 R. I. 311, 259 A.2d 408 (1969); *Denisewich* v. *Pappas*, 97 R. I. 432, 198 A.2d 144 (1964).

As evidence of Emkay's foreseeability as to care taken by New England to prevent the leakage from the drums reaching the rest of an in-transit cargo, we need only refer to the testimony of the manager of Emkay's plant. He has been on the job at Emkay for over 25 years. He stated that there is a leakage factor in any liquid shipped in a steel container, whether the container be new or reconditioned. This witness explained that Emkay, through its experience, had discovered that there was a smaller leakage factor when it used reconditioned rather than new steel drums. His estimate as to Emkay's leakage ratio varied. At one point he set the percentage of "leakers" at "one or two per thousand drums" shipped. He also gave a ratio of "one drum in 600" and later said that his company was willing to take its chances that a leak would occur while the drums were moving on the road in motorized vehicles. He said the risk of a sudden unexplainable leak was something that was accepted by anyone who ships liquid in drums.

We think it obvious from the manager's testimony that it mattered little to Emkay what New England did to

48

safeguard the other cargo that might have been on board from the detergent which suddenly spouted from a porous drum. The manager emphasized that Emkay shipped some 500 to 600 drums in the course of 6 weeks via New England. He conceded not only that there was a possibility of leakage every time a shipment was made, but also that he was aware that New England's cargo on the day in question consisted of some four or five different shipments. The manager also admitted that his company never sought to consolidate its deliveries so that its shipment could occupy one entire vehicle and thereby eliminate the possibility of damage to another shipper's goods.

The trial justice refused to make a finding of an independent supervening cause, and we believe with good reason. The record indicates that Emkay has had a long experience with New England in shipping its product over the road. The testimony indicates that Emkay was well aware but little concerned that New England took no special precautions to elevate the greige goods of customers such as S. M. S. and protect them from the "leakers" that were part of a mixed cargo. Emkay instead took a risk. If the leakage was small, hopefully the cardboard under the barrel would absorb it. If the leak was of large proportion, Emkay would absorb the loss and simply consider the payment as part of the cost of carrying on a business where liquid leakage is a matter with which one must contend and for which at times one must pay.

Consequently Emkay knew, or certainly should have known, that New England would limit its defense against Emkay's leakage to cardboard sheets and nothing else. We have in this case concurrent causes of negligence for which Emkay can be held responsible for its actions.

The third-party defendant's appeal is denied and dismissed.[4]

*Gunning, LaFazia, Gnys & Selya, Guy J. Wells,* for plaintiffs.

*Abatuno & Chisholm, Vincent J. Chisholm,* for third-party defendant, Emkay Chemical Co., Inc.

---

[4]While this appeal was pending, a stipulation signed by counsel for all litigants was entered in the Superior Court dismissing any and all actions brought by or against New England. The stipulation also provided that any final judgment that might be obtained by S. M. S. would be reduced by the sum of $686.

A second stipulation was filed in this court in which it was agreed that Emkay's appeal so far as it related to New England would be dismissed with prejudice.